minutes for rebuttal. Let's just make sure everybody gets settled because we have a lot of people moving around. All right, I think we're good to go. You may proceed. Thank you, Your Honor. May it please the Court, Jim Murray, on behalf of the appellant plaintiff for the Madeline Chocolate Company. The trial court's denial of Madeline's post-trial 50p motion is, of course, reviewed by this Court to no avail. So this is the question. Did the jury or the jury's verdict to introduce sufficient, legally cognizable, extrinsic evidence under New York law that clarified the ambiguity identified by the district court between the plight exclusion and the windstorm endorsement as it relates to storm, surge, wind-driven water loss? The answer is no. The Great Northern called one witness to trial who had any personal involvement whatsoever with the sale of this policy. Corker doesn't meet on this issue, and I cross-examine it. He readily admitted there were no negotiations or any other communications whatsoever. Well, I guess I think my more fundamental question is whether the C-Board standard that would apply at summary judgment does apply at trial or whether you just default back to what the judge instructed the jury on, which was just the standard preponderance instruction for a jury. And, I mean, we had a case. It was not an opinion. It was a summary order that acknowledged it's not really clear under New York law, which it is for a trial, whether the C-Board only applies pretrial or whether it applies post-trial. And so I guess I'm trying to make sure I'm not missing something. Well, so, Your Honor, I take the question, but here's the most important part. There are two—we are asking for a new trial in the election, but that's a small part of our request. This should be reversed to no. And in your summary order, the summary order of 2018, the Court made clear that the interpretation of the agreement was a matter of law. And it toyed—Your Honor's toying with—that's not the right place—but Your Honor's discussed the possibility that that should be interpreted before this Court in 2018, that ambiguity. And the Court found that that windstorm endorsement applied to the entire policy. So, can you explain to me, like, what you think this Court's holding in our first Madeline decision? And, obviously, somebody on that panel was here. But what do you think is the law of the case that we have to apply? I think the law of the case, most importantly, is that the windstorm endorsement and the windstorm definition in that endorsement, this Court held as a matter of law, applies to the entire policy, not just to the endorsement. And this Court held that as a matter of law. It also held that the windstorm event, Sandy, was caused by storm surge. It's not super storm or hurricane Sandy. And the Court held that that was caused by water being pushed into the factory, which it was, by wind. So those two—and here's what happened. Your Honor suggested, should we find an ambiguity right now? It's a matter of law, back in July of 18. And, if you'll recall, the baseball analogy tied most of the round of issues. And Your Honor took a second look at it and said, let's have a replay, and in carefulness of the district court, and instructed Judge Geary to do the following stuff. You look at this policy, and you determine whether there is a windstorm. You determine whether there's an ambiguity created by the windstorm endorsement's definition vis-a-vis the flood exclusion. Those are your—that's this Court's words, vis-a-vis. And you instructed the judge that at 10-97-113 is his 17th page opinion, that he analyzed those provisions and did what you told him to do. And then he decided, across our judgment, and this in and of itself is not incorrect, that he was going to send this to the jury because he thought there was sufficient evidence to go to the jury. Under New York law, extrinsic evidence, if it's properly cognizable, could clarify that ambiguity. Now, in retrospect, on that stormy judgment ruling, all he held up was the same things that he held up in our post-trial denial of our motion, and that is the 2001 cancellation of the flood policy that didn't have a windstorm endorsement, didn't have an anti-concurrent causation clause that competes with the standard form part of the policy. And then he holds up the fact that in 2011, Madeline's broker answered a request for a certificate of insurance on flood insurance, and he matched it with the FEMA policy. That's where you know he got from the National Flood Insurance Program. That's a totally different outcome. It didn't have anything that this court said back to it. I think we're kind of conflating two different issues, and I want to make sure I'm thinking about them. There's obviously the motion for judgment, and then there's the motion for new trial. Why wasn't the information that you gave? They did not think they were at risk of flooding. The fact that they only said that they had 3 million, the fact that they produced a report that documented windstorm floods as different categories, the internal emails showing the pivoting, why is that not enough to defeat at least the judgment as a matter of law? Because it doesn't go at all, Your Honor, to the ambiguity that has been identified by this court. Well, right, but the ambiguity, I think, speaks more pointedly. Tell me why I'm wrong. Why am I wrong that the ambiguity speaks more pointedly to the denial of the motion for a new trial because of the case of violation of the law of the case doctrine? Well, it speaks more pointedly, Your Honor, to the motion as a matter of law because this court identified and then Judge Deary identified the ambiguity, and the only way, under any other, most state's law, that ambiguity would have been the end of the game, and it would have been in favor of the runner. Under New York law, extrinsic evidence, because proper can clarify that ambiguity. To be proper, it has to be contemporaneous at the time of contract and go to the issue that's identified as ambiguous, and that is the conflict between those two provisions. The anti-concurred causation of the windstorm says it doesn't matter if there's a flood. If that water got there by the wind slamming into the factory, then it is covered, and that is the ambiguity that needed to be clarified. So for Judge Deary to point to a policy that wasn't a flood policy, so it was a flood policy 10 years earlier and didn't have the windstorm endorsement, or the FEMA policy, totally different now, didn't have the windstorm endorsement, it did not have the characteristics that this court sent back to Judge Deary, and Judge Deary properly identified as an ambiguity, so there is no extrinsic evidence properly cognizable under New York law, Your Honor. But why did this go to the trial then? I mean, you should have won on summary judgment, right? Absolutely should have. Okay. But what's puzzled me is that so it goes to trial, and the judge gives a jury instruction that's completely different from what you're arguing now, and you didn't object. That goes to the jury. Your Honor, first of all, the first half of the case, the judge said to me, when I objected that the Green-Northern was arguing that the windstorm endorsement does not apply to the policy in front of the jury, sidebarred, Your Honor, second circuit, and he said to me, you expect me to follow a second circuit summary order? First time in my life I've been speechless. Yes, I expected it to do that. Your Honor, and then once... Well, the summary order being the one in this case means? Absolutely. You're not referring to Katelyn or Katlyn. No, but the summary order being Judge Taranis and Frank's partner did not support a city designation. That was clear. And that is the reason, Your Honor, we went back down and tried this case because of the summary order. All right. But if you're being consistent, you would have... I would have insisted that the jury be instructed on the same thing that you're saying is the standard that district court should have been We filed motions in limine to advance the trial. We had a sneaking suspicion that the insurance company might argue that this was not part of the case. We had a motion in limine, don't let them argue against the law of the case, and make sure it's only extended to Kevin to properly admit it. Those were deferred and then during trial consistently denied to where the court got mildly irritated with me for raising this question that I don't understand how this evidence is going in when I've got a second circuit order and said that you need to go back to trial and try to have a jury that's been identified. The courts... I mean, I think the judge would say it was because they had a jury instruction on it. The jury instruction, Your Honor, doesn't look... Let's assume the jury instruction was proper and cured that issue. It does not cure the JMOL issue that there was zero extensive evidence. All the stuff that Great Northern put in, in violation of the legal name of this court's order, still doesn't go to the directors of the order that there was an ambiguity that should be resolved and figured. There's no email that says, hey, hey, Madeline, you have this mainstream endorsement, but it really doesn't trump the pledges. So if you're thinking that, don't write a post. Of course there wasn't that evidence in the contract of adhesion, the standard form language. If I could just say what this underwriter said, he admitted no negotiations, nothing with respect to the windstorm endorsement, the flood excuse. There was no contemporaneous evidence at the time of contracting that would clarify the ambiguity that this court told Judge Jerry to go back and look at. And Judge Jerry, quite properly, said, you know, you're right, there is an ambiguity in this anti-concern condition clause in the windstorm endorsement, and as it relates to the flood excuse. And that is a significant time outlining that there's no cognitive evidence. It's nine years later. I do believe that in 2018, Your Honors, you could have ruled as a matter of law, the ambiguity is true in our favor. Carefully send it back to Judge Jerry. Not one piece of evidence. And Judge Sullivan did quite right. Those cross-summary judgment motions in 2019, the only evidence identified by Judge Jerry to lead to a trial was the two pieces I'm talking about, part of the denial of post-motion. You know, the cancellation of the flood insurance and cleanup policy. That should have never gone to trial. It did, and it could be an arrest. But we knew we would be up here, but we decided it would be the mandate of this court ruling. All right, well, you've reserved three minutes for rebuttal, so we'll get another good slug out of you, Mr. Murray. But first, we're going to hear from Mr. Hacker. Thank you, Your Honor. As set forth in our brief, there are two easy and related ways we can learn here. One is to simply defer to the jury's unanimous, equivalent assessment. Based on extensive evidence, the parties never intended losses from a wind-driven flood or storm surge. Okay, so can you tell me, though—I'll start with the same question I posed to your counsel—what do you think this court's holding in our first Madelon decision was? What did the panel decide in that case? I think we can just read it for what it says, which is the error that the district court had made in the prior decision of relying on the Katrina cases that had a different language of—the court said those cases are extinguishable for that reason, so you shouldn't go by them. And so we remand for you to decide—and it's very explicit, we don't have ambiguity in fact in my mind, it's not what the court said—for you to decide whether there is an ambiguity when you, as Mr. Murray was saying, apply the windstorm, when you recognize that the windstorm definition applies to the whole policy. Take that, don't pay attention to the Katrina cases, and then decide whether there's an ambiguity. This court can say there's an ambiguity. You have to decide that for an inconsistency, and then proceed from there. And that's exactly what the court did. Nothing is at all inconsistent with what the court did, nor is there anything inconsistent, nor is there any reason this court could not, in a de novo review, leave the policy and decide, as we have always suggested, that it is unambiguous, that it unambiguously, as it says in the first reading, excludes losses, coverage for losses, from flood, whether it's driven by wind or not. The definition in the windstorm deductibles, what it's called by the way, is the windstorm deductible. So you don't think that the—so your position is that the first Madeleine did not preclude your reading, the position that you're taking now? As I said, I'm just literally reading the decisions, and you have to decide that, because— You, the judge, the district court. Who's the you? No, the judge, so that I can reconsider your analysis of the policy, eliminating the Katrina cases effectively, and recognizing that I, as we have always conceded— But didn't they also say that it makes it very difficult to read a policy in a way that avoids a conflict between the windstorm endorsement and the flood exclusion? So the question was, the judge has to figure that out, and there's no difficulty at all. As you've already said, just reading the policy makes absolutely perfect sense, because— So you're saying you should have won on summary judgment. That's all in our submission. I don't need to spend a lot of time on that. Okay, but the standard would have been, then, the seaboard standard, right? That there's no other reasonable interpretation. To get to ambiguity, it's true. The policy is ambiguous. There are two reasonable interpretations, which puts the burden on the insured to exclude the interpretation proposed by the insured as reasonable, and we have done that. It is not a reasonable interpretation because, among other things, it creates just a near reconcilable inconsistency between the flood exclusion and the windstorm endorsement, and, as we know, the first duty of a court reading a policy is to hold— So I guess I'm trying to figure out, when does a case like this ever go to trial? Because it seems to me what you're saying is you win because there's no other reasonable interpretation of this policy. And Mr. Murray is saying he wins because, to the extent that there is another reasonable interpretation, he automatically wins. And the judge, by deciding it's going to a trial, for a jury to decide, that must mean there are multiple reasonable interpretations. So for a judge to decide that correctly, right, that's a de novo question of law. For the court, whether there's ambiguity, whether there are multiple interpretations. So that's in every case where there's multiple interpretations, if there's disputed extrinsic evidence that goes to the jury. Our principal submission, but not our only submission, our principal submission is that you don't even get to that because there's no ambiguity. Their interpretation is not a reasonable one for the reasons I've explained. Even when you apply the definition to the whole policy, what the definition says is windstorm means the following things. It's not used elsewhere in the policy. It's not used in the Congress provision. For all that's worth, they include the anti-concurrent causation clause and all of that. It only applies where the court appears. Right? And it appears. No, I get that. And this might have been a very effective argument to make to Judge Deery. But it seems to me that he didn't agree with you, right? No, no, no. He did agree with me. He should have agreed with me, but he didn't. So it's the first argument that as a matter of law, this court can say, as a matter of reasonable interpretation. But moving beyond that, because Judge Deery did disagree with us, although he came very close to agreeing. I mean, he did the exercise of inserting the word windstorm into cover peril or whatever here. And then he tried to read the policy as if, rather than cover peril, it said windstorm. And he was so close to agreeing with us because when you do it that way, what he said— But doesn't that create—doesn't that prove the ambiguity? Like if—like at the very least, you—I'm not sure that you conceded in what you said earlier. At the very least, didn't the Madeline decision suggest that the windstorm and DAP and Dortman added a clause to the definition of cover peril for the entire policy? So at the very least, would you agree that that's what Madeline did? No, not in that way. Instead, it applies to the whole policy. The definition applies to the whole policy, which is true. But what the definition says is this is the definition of the word windstorm. So you supply that definition wherever the word— Okay, if we disagree with you that that's what— No, but I'm saying—this is important. If we disagree with you that that is not what Madeline held, and instead Madeline held that the windstorm endorsement adds an ACC clause to the definition of a cover peril for the entire policy—and I'm quoting from it—doesn't the exercise of him trying to put windstorm in and it not working suggest an ambiguity? I don't disagree with that. I don't think that's the right—that you are—even under the course of our opinion, when you add to the whole policy, that doesn't mean you read the word windstorm in the cover peril. It just means you apply the definition whenever you see the word windstorm. That's always been our fundamental disagreement. But I don't want to get wrapped around the ass on that because I agree with you that the judge rejected our argument, said it's going to be too ambiguous, and then did what the courts are supposed to do. When you find an ambiguity, whether or not—if you find an ambiguity, you then determine whether or not there's sufficient extrinsic evidence disputed to go to trial. No extrinsic evidence— But what's the inquiry at trial then? Does it just revert to then what was the intent of the parties, or is it the same inquiry that it was at summary judgment as to whether or not this agreement is susceptible to no other reasonable interpretation, which would be a higher standard? So I don't think it's the latter, and I don't think there's cases that say that in the context of reviewing a trial for anything. I think the Catlin case got it right. Well, the Catlin case basically said, we don't know, right? Well, but it analyzed it and said, as long as the jury is asked to decide what the intent was, and if the insurer—the burden's on the insurer, right? So if the insurer doesn't prove that their view was the one endorsed by the parties, then they lose. If there's still—the evidence is still equivocal, the insurer loses, right? So the insurer wins by establishing that the intent of the parties was to do one view or it was about the— I have to say, it's just been puzzling to me that the New York law is not crystal clear on this, but at least Catlin suggested that New York clear is quite confusing on this. And so should we be referring this—certifying this to the New York State Court of Appeals and ask them to clarify? I don't think you need to, but we've got two points. Yeah, tell me why not. So the two points are, one, I think, the Seymour standard you're referring to in terms of the heavy burden is about the initial inquiry of excluding the possibility of another reasonable interpretation. I don't think you could ask a jury to say, which is the reasonable interpretation? That's a question of law for the court. A jury is—it's all extensive evidence about intent, right? So it's just sort of an awkward question to ask jurors, you know, if you've excluded the possibility that this interpretation is reasonable. So I don't think that's what was meant. They rely mainly on the Kavanaugh case. And in that case, it cites the New York case. Did you look at that? When Kavanaugh says the burden is on the insurer to establish that it's an only reasonable interpretation, I think he's referring back to that initial stage of establishing whether or not there's an ambiguity. He's not talking about the burden at trial because New York is exclusive. It cites New York. When you look at New York, you'll see that that's not talking about the trial burden at all. I don't think the reason that you said that it makes much sense. I would like to get into the actual trial evidence because counsel keeps saying there was no extensive evidence. It's just nothing more—nothing could be further from the truth. There was a lot of extensive evidence, and critically, it was completely one-sided. All the evidence in this case is—there's no evidence, zero evidence from Madeline that they never intended for the Greensport endorsement that was added in 2006 to create this coverage that they had consciously foregone six years, five years earlier. They didn't frame anybody's testimony like that. What's on the other side of it? Judge Pérez went through several of the categories. There's even more, but just to restate them, it's the fact that Madeline canceled its $2.5 million in flood coverage in 2001 because it thought flood coverage was too expensive and they didn't need it. And so the idea that they self-celentio was like, actually adopted five years later without any evidence that anybody was thinking about it or talking about it— So if I think that—if I just can cut in here, sorry. If we're of the view, if the Court believes that all of the evidence from—about your client's internal actors was improper, why did the jury instruction handle that appropriately? So two points on that. First, SR International said that's how you're supposed to handle that evidence. That's what you do is you give a limited instruction so the jury knows how to use that evidence and how, most importantly, how not to use it. How did they detect the instruction? The instruction here said, you cannot consider that evidence the uncommunicated evidence of intent for interpretation of the policy. All of that evidence came in for other purposes, and it's not impermissible for SR International to use it when we talk about what those other purposes were. First of all, Mr. Smith, that evidence, his entire testimony when you look at it, and I urge you to read his testimony, he's not talking about uncommunicated intent like a secret meeting in a hallway or a memo that wasn't circulated. He's just describing Chubb's position when the claim was made. What physically happened, why it is that Chubb paid $4 million in wind storm coverage and then they, the flood coverage. He's just explaining the difference. He's explaining the position. It's not uncommunicated intent. It's just the parties' positions that the jury is being asked to resolve as soon as they say they know what it was. So that's a good example of it's not actually the kind of uncommunicated intent that anybody should be concerned with. The through-line of your cases, Your Honor, I think you'll see it, is that uncommunicated intent alone can't create an ambiguity. There's lots of other evidence here that enable the jury to quite easily reach a determination that the parties intended or did not intend for the policy to cover these kind of losses. Mr. Rosen was their witness. He was a Chubb employee. They called him. On their direct of Mr. Rosen, they asked him about an internal wind storm strategy document. That was their decision on direct. We, of course, were entitled to put that in context, explain what the wind storm strategy was. They probed Mr. Rosen why it was we didn't use the ISO forms, which have the words storm surge, storm surge. We're, of course, entitled to explain what the difference is between the ISO forms once they've been issued and to say that wind-driven, weather-driven, through-line-of-your-case, is the same thing as storm surge. We're entitled to explain, as I said earlier, why it is that we would pay $4 million for a certain kind of damage, wind damage, and not cover wind-driven flood damage. And then there's the Scott White letter from 2014, where it's an exhibit the jury's going to have where he says, we negotiated. We negotiated for the wind storm endorsement, and we paid additional premium. That's what he says. We're entitled to put that in context and explain that that never happened, that there was no negotiations over that, and explain why the wind storm endorsement wasn't added. And all of that's absolutely perplexing. We're a sovereign international with the limited instruction, which the court gave. And on the basis of that, there's no reason to think that the consideration of all of this evidence is just extrinsic evidence. It's an anyway problematic, so it doesn't matter a lot. It's absolutely more than much more than sufficient to justify the determination of the jury today that the parties did not intend for this policy to come into law. All right. Okay. Thank you very much, Mr. Hacker. We'll now hear from Mr. Murray for three minutes of rebuttal. SR International is irrelevant, Your Honor. It still has to be tied to something in the case that it's programmed. So in SR International, you'll recall that situation with the policy bounds or the policy terms. Twin Towers, either $350 billion or $750 billion, depending on the definition of occurrence. Of course, in that context, the parties were allowed to talk about their negotiations post and what they have done historically. Nothing to do with this case where there is no ongoing negotiations. I did get cross-attempted, Mr. Rosen. I was tracked by cross-attempts, and he admitted that there were no discussions with respect to the Windstorm Endorsements juxtaposition to the flood exclusion. And this is where I want to slow down. I want to slow down. Because it's seven years later, but this court's opinion at a joint exhibit, A93, page 2, and there was a long discussion. There was briefing. I listened to the argument with my colleague Ed Joyce from Jones Day that did it, and I listened carefully. And the court held that policy main forms do not expressly define windstorm. Instead, the policy contains an endorsement which defines the term windstorm for the entire policy. These three witnesses got up on the stand and said to the jury, windstorm endorsement definition, that doesn't apply to the entire policy. No way. That's not how we do it. No one had been giving me. You know why? Because you take the four corners of the flood exclusion, which we've never said the four corners are ambiguous, but you don't look at it vis-a-vis anything. You just look at the four corners, ladies and gentlemen. And I'm objecting time and time again, Your Honor. How are they even saying this? No. Your Honor, that is the jury instruction. Again, our first argument. I want the case. Right. I mean, I think I get it. You're saying the jury instructions may have addressed the uncommunicated expert evidence, but they did not address this particular issue about whether or not it went to the entire policy. Well, certainly it did not, but it didn't address the other either, Your Honor. That instruction says that Madeline, that their intent being what we sense, not a strike to Madeline, it doesn't say we can't consider it, which it should have. But here's the other thing. After two days of testimony by great judges saying to the jury, it's like reading the policy. It's not fine. It's not ambiguous. Two days. How could a jury be blamed for making this finding with that single instruction? It would be impossible for my objections to hear that to not think there was some relevance to it. But again, I don't want, I'm not taking the trial over, not pretty much, but I think it should be decided as a matter of law. Now, we have no burden. We have no burden. And Judge Sullivan, if I could, the issue, if I could say it again, the only issue for trial on that cross-economy judgment motion, denied cross-economy judgment on the basis that he was going to let it go to trial to see if there was any legally cognizable experience of evidence that clarified the unambiguity. What does that mean? You're going to have a trial to see if there's any evidence? Well, that's... A jury's there, and they were going to ask in a verdict form to say, let us know if you see any evidence here. So what was the jury's verdict supposed to decide? Does the evidence that's submitted in this case clarify the ambiguity? That I'm instructing you exists. We did object to the indestructibility that goes with ambiguity. So that would have been, the verdict form would have said, did the evidence... Say that again. I want to make sure I understand it. The jury form would have said that Greg Morland carried his burden to prove the flood exclusion applied, given the ambiguity in this policy between the windstorm endorsement and the flood exclusion and their current causation competing forms. If he hadn't clarified that, your Honor, here would be the evidence. Again, Greg Morland saying, he made a windstorm endorsement, but by this policy, if you think that's going to cover what, I've heard you, because we really mean the problem. We don't feel like that exists in this record. It's all at most, it is speculative. We have no burden whatsoever. But the one thing we did do, he's quite right, at joining the 2814, showed that the water exclusion, the ice or water exclusion, could have been used. And that's exclusion, your Honor. It chills this whole case for us. It said, hey, by the way, storm surge is included in our flood exclusion. That in and of itself was evidence that the industry knew that if they wanted to plug this gap, that they created, by a contract of adhesion, they could have used ISO form and identified it in record 2814 that says storm surge, you still don't have it. So at the end of the day, your Honor, this court, now as it could have done in 2018, but it's now 2023, reduced to no, Judge Geary properly found in the carefully paid 17-page opinion there was an ambiguity. Nothing clarified that ambiguity. And the court should now grant the direct judgment in favor of Madeline on the issue of liability and send the trial back on damages. All right. Thank you very much, Mr. Murray. And Mr. Hacker, we'll reserve this hearing.